UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DONALD ROSEN,** | ) | **On appeal from U.S. Bankruptcy Court** |
| | ) | **for the Northern District of Illinois** |
| | ) | **Eastern Division** |
| **Debtor** | ) | |
| | ) | **Bankr. Case No. 15-0897 (DRC)** |
| | ) | |
| **DONALD ROSEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **v.** | ) | |
| | ) | **Civil Case No. 16 C 10686** |
| **ATTORNEY REGISTRATION AND** | ) | |
| **DISCIPLINARY COMMISSION; and** | ) | |
| **EDUCATIONAL CREDIT MANAGEMENT** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Appellant Donald P. Rosen is a well-educated man.  Since 1980, he has earned a
bachelor's degree, two master's degrees, and a J.D.   He is a certified public accountant and a
member of the Illinois state bar.  Like many others, Rosen funded his education with student
loans.  Today, having spent several years in school and having deferred all but about $11,000 in
payments over 37 years, Rosen's student loan debt has ballooned to more than half a million
dollars.[1]

Rosen has other problems as well.  After misappropriating $80,000 of client funds, he
lied to a police officer and falsified bank records in an unsuccessful effort to conceal his
wrongdoing.  The Illinois Attorney Registration and Disciplinary Commission ("ARDC") has
suspended Rosen's law license until at least September 2018.

---

[1] Rosen's student loan debt stood at $495,036.87 as of Sept. 7, 2016.  (Bankr. R.
222.)  With interest accruing at $52.55 per day, that amount is now just over $515,000.

While the disciplinary proceedings were pending, Rosen filed a Chapter 7 bankruptcy proceeding. He asked the bankruptcy court to discharge his student loan debt and enter a declaratory judgment that ARDC had violated his constitutional rights. The Bankruptcy Court denied both requests. The court concluded it had no jurisdiction over the declaratory judgment claim and therefore dismissed his claim against ARDC. The court also found Rosen's extensive student loan debt not dischargeable under 11 U.S.C. § 523(a). For the reasons explained here, both orders are affirmed.

## FACTUAL BACKGROUND

Donald P. Rosen has devoted substantial time to higher education. He earned a bachelor's degree in accounting from Northeastern Illinois University in 1983. (Bankr. R 222.) While working as an accountant for non-profit organizations, he pursued master's degrees in Accounting and Business Administration at DePaul, finishing in 1993. (*Id.*) In 1994, Rosen enrolled at Chicago-Kent College of Law. He earned his law degree in 2001, and was admitted to the Illinois Bar in 2003 at the age of 50. (Bankr R. 250.)

After earning his law degree, Rosen consolidated his various student loans into one federally-backed loan with Appellee Educational Credit Management Corporation ("ECMC"). (Bankr. R. 222.) This consolidated loan extinguished all Rosen's prior student loans dating back to 1980, leaving him with a single indebtedness that had grown to $495,036.87 as of September 7, 2016. Because he was in school for many of the years since his first student loan, payments were deferred until 2007. (Bankr. R. 250.) With the help of his mother, Rosen made approximately $11,000 in payments before defaulting on the loan in 2011. (Bankr. R. 233.)[2]

After being admitted to the practice of law, Rosen continued working as the chief financial officer of a non-profit organization, the Larkin Center, while attempting to establish a

---

[2]     Rosen originally claimed to have paid just $3,000 towards his debt (Bankr. R. 254), but testified at the bankruptcy trial to payments of $11,000. (Bankr. R. 233). Appellee ECMC did not dispute this change.

private law practice.  Rosen was terminated from his position with Larkin Center, where he was earning $80,000 per year, in 2008, and then began practicing law full time.

His practice did not go smoothly.  In August 2012, ARDC charged Rosen with several violations of the Illinois Rules of Professional Conduct.  In a complaint at that time and amended a year later, ARDC asserted that Rosen had knowingly misappropriated some $85,000 from his client escrow account and then lied to a police officer investigating the matter.  (Bankr. R. 270.) ARDC charged that Rosen had lied during the course of the course of the ARDC's own investigation as well, and had presented fabricated bank records in an attempt to cover up his wrongdoing.  (*Id.*)  The ARDC's Hearing Board heard Rosen's case at a proceeding held across four days: September 26 and 27, 2013; December 16, 2013; and January 3, 2014.  (*Id.*)

Rosen, acting *pro se*, defended himself against the charges by placing the blame on his 82-year-old mother, Selma Frazin, who he claimed had been helping him with ministerial tasks at his office.  (Bankr. R. 279–86.)  "Her unfamiliarity with the difference between business and trust fund accounts," Rosen stated, led her to "inadvertently" use client funds for Rosen's own business expenses.  (Bankr. R. 251.)  Frazin, who "was embarrassed and did not want [her son] to be upset" with her, then falsified the bank statements that an unknowing Rosen later provided to his clients, the police, and the ARDC's investigators.  (Bankr. R. 283) (quoting an affidavit signed by Ms. Frazin and provided to the Hearing Board).

On May 14, 2014, the ARDC's Hearing Board found by clear and convincing evidence that Rosen had engaged in the charged conduct.  (Bankr. R. 302.)  In ruling, the Hearing Board stated that it found Rosen and his mother's testimony lacking in credibility and truthfulness: "[Rosen] and Ms. Frazin have changed their stories so many times it is impossible to determine when, if ever, they are telling the truth."  (Bankr. R. 272.)  Based on the available evidence, the Hearing Board doubted that Rosen's mother had the knowledge or ability to alter the bank statements—or that she was even in Illinois at the time.  (Bankr. R. 286, 294.)  The Hearing Board recommended that the Illinois Supreme Court suspend Rosen's law license for three

years and until further order of the court. The Board felt "strongly that he should be required to establish his fitness before he is allowed to return. Nothing in the record demonstrates that [Rosen] is currently willing or able to abide by the Rules of Professional Conduct." (Bankr. R. 305.) The Hearing Board further recommended that Rosen be required to pay $57,646.78 in restitution to one of his former clients. (Bankr. R. 306.)

Rosen appealed the Hearing Board's decision to the ARDC's Review Board, alleging numerous procedural and substantive errors. On September 18, 2014, the Review Board ruled in Rosen's favor, "reluctantly find[ing] that the Hearing Board erred by accepting a written summation of the evidence" by reviewing a PowerPoint presentation the ARDC's Administrator had used during his closing argument.[3] (Bankr. R. 311.) The Review Board remanded the case for a new hearing.

The Administrator then appealed the decision to remand, filing a petition for leave to file exceptions with the Review Board's ruling with the Illinois Supreme Court. On January 16, 2015, the Illinois Supreme Court issued two orders. The first, M.R. 26812, enforced a rule to show cause previously issued in the case and imposed an immediate interim suspension of Rosen's law license under Supreme Court Rule 774. (Bankr. R. 318 ("Interim Suspension Order").) The second, M.R. 27001, granted the Administrator's petition to file exceptions and ordered the Review Board to consider the merits of the Hearing Board's findings of misconduct, "unrelated to whether the Hearing Board violated Commission Rule 284(b)." (Bankr. R. 315 ("Procedural Order").) On remand one month later, the Review Board reaffirmed the Hearing Board's original findings and recommendations. (Bankr. R. 324.) Rosen's disciplinary proceeding was finally concluded on September 21, 2015, when the Illinois Supreme Court lifted the interim suspension order and adopted the Hearing and Review Boards' recommendations:

_____

[3] The Review Board's written opinion noted that the Chair of the Hearing Board was apparently aware of the rule, quoting from a transcript of the Chair stating: "We're not going to consider it for evidence; but it's a nice way to consolidate some of the evidence that's been around." (Bankr. R. 310.)

the Court ordered that Rosen pay restitution of $57,646.74 and suspended his law license for three years and until further order of court. (Appellant Brief [9] ("Appellant's Opening Br."), 6.)

Rosen has not worked since his law license was suspended. Ever since, he has asserted that the ARDC's "character assassination" renders it impossible for him to obtain professional employment. (Bankr. R. 226.) He has also claimed to be in poor health and incapable of physical labor. His only income comes from Social Security payments amounting to $15,600 per year (or $1,300 per month). (*Id.*) Rosen's wife still works and earns roughly $60,000 per year. (*Id.*) She is responsible for all of the Rosen household's expenses of $2,300 per month, although Rosen contributes $500 per month out of his Social Security income. (Bankr. R. 225.) Rosen's only personal expense is a $100 monthly cell phone bill. (*Id.*) Rosen has no dependents, and no debt aside from the student loan—having paid off his home mortgage in 2014 and discharged the remainder of his debt in bankruptcy. (*Id.*) At the time he filed this appeal, Rosen was 63 years old.

## PROCEDURAL POSTURE

On March 13, 2015—after the Review Board's final report but before the Illinois Supreme Court finalized Rosen's punishment—Rosen filed a Chapter 7 bankruptcy petition. (Appellant's Opening Br. 6.) On June 8, 2015, Rosen filed the current adversary action against ARDC and ECMC.[4] Rosen asserted two claims for relief. Count I sought the discharge of his student loans in bankruptcy as an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8). Count II sought a declaration that the Illinois Supreme Court violated Rosen's due process rights by depriving him of a fair disciplinary hearing. (Bankr. R. 248–56.)

### 1. Rosen's Declaratory Judgment Claim against the ARDC

The ARDC promptly moved to dismiss Count II under Federal Rule of Civil Procedure 12(b)(1) (lack of subject matter jurisdiction) and (b)(6) (failure to state a claim upon which relief

---

[4]    Rosen originally sued several banks and credit institutions, but ECMC intervened and replaced those institutions as the proper party in interest as the guarantor of Rosen's loans. (Bankr. R. 221.)

can be granted), and to dismiss itself as a defendant. (Bankr. R. 261.) ARDC argued that Rosen's complaint amounted to "an improper attempt to secure a reversal" of a state court decision in federal court and was therefore barred by the *Rooker-Feldman* doctrine. (Bankr. R. 265) (citing *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 431 (7th Cir. 1999)). The Bankruptcy Court agreed, and granted the motion to dismiss with prejudice on July 24, 2015. (Bankr. R. 334.)

Rosen sought rehearing under Federal Rule of Bankruptcy Procedure 8015, but Judge Cassling declined to revisit his ruling. (Bankr. R. 547.)[5] First, he found that the *Rooker-Feldman* doctrine did indeed apply to bar Rosen's claims. (Bankr. R. 547:16–551:16.) While at that point the Illinois Supreme Court had only imposed the interim suspension—the final three-year suspension came down one month later—Judge Cassling found that "[u]nder Illinois law, an interim suspension order is a final judgment" sufficient to trigger *Rooker-Feldman*. (Bankr. R. 550:1–2) (citing *Mehta v. Att'y Reg. & Discip. Comm. of the Sup. Ct. of Ill.*, 681 F.3d 885, 887 (7th Cir. 2012)). Though Rosen framed his argument as a procedural challenge to his suspension, the bankruptcy court recognized that it sought the same end as a direct challenge—a review of Rosen's suspension—and was nonetheless barred by the *Rooker-Feldman* doctrine. (Bankr. R. 551:7–14.)

Independent from the *Rooker-Feldman* question, Judge Cassling also found that the bankruptcy court lacked subject-matter jurisdiction to enter the declaratory judgment. (Bankr. R. 551:17–553:3.) A declaration concerning Rosen's purported due process violation was not properly before the bankruptcy court, Judge Cassling concluded, because such a declaration would "not affect the amount of property available for distribution or the allocation of property among creditors." (Bankr. R. 552:20–22.) As a result, Rosen's claim was neither a "core

---

[5]       Judge Cassling noted that a Rule 8015 motion for rehearing was not the proper avenue to challenge the dismissal, and that Rosen should have moved for relief from judgment under Rule 9023 or 9024. (Bankr. R. 547:5–15.) Judge Cassling nevertheless addressed Rosen's objections on the merits.

proceeding" under 28 U.S.C. § 157(b) nor a "non-core related proceeding" under 28 U.S.C. § 157(c), and the Bankruptcy Court lacked jurisdiction to hear it. (Bankr. R. 552:24–553:3.)

After losing his motion for rehearing, Rosen next filed a motion for leave to appeal the dismissal of Count II to the District Court. This too was unsuccessful. Judge Guzman of this court concluded that Rosen was not permitted to appeal the dismissal of Count II (the due process challenge) as of right, because the other prong of the adversary case—the core dischargeability question—was still pending. (Bankr. R. 207) (applying FED. R. CIV. P. 54(b) and 28 U.S.C. § 1291.) Judge Guzman also rejected Rosen's alternate contention that the matter was appropriate for discretionary interlocutory review under 28 U.S.C. § 1292(b). (*Id.*) To the contrary, he concluded, accepting an appeal from the dismissal of Count II would not "materially advance the ultimate termination of the litigation," but would instead delay it. (*Id.*) (quoting 28 U.S.C. § 1292(b)).

After Rosen's request for leave to appeal was denied on November 3, 2015, the bankruptcy court returned to Count I: Rosen's request for a discharge of his student loan indebtedness.

## 2.    Rosen's Undue Hardship Claim to Discharge His Student Loans

On September 19, 2016, the Bankruptcy Court held a trial on that claim. (Bankr. R. 221–234.) Student loans are presumptively non-dischargeable in bankruptcy; to overcome that presumption, Rosen bears the burden of proving that his loans imposed an "undue hardship" on himself and his dependents. (Bankr. R. 223, ¶ E) (citing *In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005). The legal standard for "undue hardship" from student loans is known as the *Brunner* test, after *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987). Under the *Brunner* test, Rosen had to prove: (1) that he could not maintain a minimal standard of living if he were required to repay the loan; (2) that additional circumstances exist to suggest this state of affairs is likely to persist; and (3) that he had made good faith efforts to

repay the loan.  (Bankr. R. 224) (citing *Tetzlaff v. Educ. Credit Mgmt. Corp.*, 794 F.3d 756, 758–59 (7th Cir. 2015)).

Judge Cassling conducted a one-day trial on Count I; Rosen was the only witness.  After hearing his testimony, Judge Cassling declined to discharge Rosen's student loans.  (Bankr. R. 223, 234.)  He found that Rosen failed to satisfy a single element of the *Brunner* test: on the first prong, Judge Cassling observed that Rosen had not maximized his income, and thus failed to show that making monthly payments would prevent him from maintaining a minimum standard of living.  (Bankr. R. 225–229.)  On the second, Rosen had failed to show a "certainty of hopelessness" in his financial affairs going forward.  (Bankr. R. 232) (citing *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 778 (7th Cir. 2002)).  The court also found that Rosen had not made a good faith effort to repay his loan. (Bankr. R. 234.)  Finally, Judge Cassling was unmoved by Rosen's arguments that the disciplinary proceedings were a primary driver of his hardship.  Instead, the judge observed, Rosen's suspension and subsequent "character assassination" were entirely self-inflicted.  (Bankr. R. 226–227, 230.)  In any event, as Rosen's three-year suspension would expire in 2018, he will be eligible then for reinstatement and could seek to resume his career as an attorney.  (*Id.*)

## DISCUSSION

Rosen appeals both aspects of the bankruptcy court's judgment.  With respect to the student loan discharge ruling (Count I), Rosen contends that the court erred in its conclusions regarding the *Brunner* test, and that the underlying factor in his error is the judge's mistaken belief Rosen could resume his legal career in 2018.  (Appellant's Opening Br. 3–4.)  With respect to Count II, he contends the court erred by applying the *Rooker-Feldman* doctrine to bar the complaint, and in concluding that the court lacked subject-matter jurisdiction over that claim.  (*Id.* at 3.)

1.      **Standard of Review**

This court has jurisdiction to hear appeals from the final orders and judgments of bankruptcy courts.      28 U.S.C. § 158(a).  On appeal, this court reviews the Bankruptcy Court's legal conclusions *de novo* and its findings of fact for clear error.  *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014).

Factual findings are deemed clearly erroneous where, despite supporting evidence, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake [was] committed."  *Kovacs v. United States*, 614 F.3d 666, 672 (7th Cir. 2010) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Whether a debtor has properly shown "undue hardship" sufficient to discharge his student loans is "a case-specific, fact-dominated standard, which implies deferential appellate review."  *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013); *see also Tetzlaff*, 794 F.3d at 759.

2.      **The Bankruptcy Court Lacked Jurisdiction over Rosen's Claim Against ARDC**

Rosen believes that United States Bankruptcy Court is the appropriate forum to challenge alleged denials of due process in his attorney disciplinary proceedings.   The bankruptcy court and district court (on interlocutory appeal) disagreed, and, as explained below, this court does as well.

a.      **The *Rooker-Feldman* Doctrine Bars the Court from Deciding Count II**

The *Rooker-Feldman* doctrine bars lower federal courts from reviewing the final judgments of state courts that were rendered before the federal proceedings commenced. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 554 U.S. 280, 284 (2005).  *Rooker-Feldman* prevents state-court losers from seeking review of adverse judgments in federal courts other than the Supreme Court.  *Hukic*, 558 F.3d at 431.  If the alleged injury resulted from or is "inexorably intertwined with" the state court's judgment, the federal court lacks jurisdiction to hear the claim. *Lewis v. Anderson*, 308 F.3d 768, 772 (7th Cir. 2002) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987)).  As Rosen's claimed injury arises from a final judgment of

the Illinois Supreme Court, the bankruptcy court lacked jurisdiction and properly dismissed Count II and the ARDC as a party to this lawsuit.

The Illinois Supreme Court issued two orders in Rosen's disciplinary proceeding: the Interim Suspension Order (M.R. 26812) imposed under Illinois Supreme Court Rule 774, and the Procedural Order (M.R. 27001) which remanded his case to the Review Board to review his case without regard for whether the Hearing Board committed procedural error by reviewing the PowerPoint presentation.  Rosen insists that he accepts the finality of his interim suspension, and is only seeking a declaratory judgment as to whether the second Procedural Order violated his due process rights.  (Reply Brief of Appellant to Brief of Defendant-Appellee ARDC [20] ("Appellant's Reply to ARDC"), 3–4.)  The bankruptcy court was unconvinced by Rosen's suggestion that by addressing procedural wrongs, he was not in fact challenging the Supreme Court's decision.

The Seventh Circuit has consistently held that the *Rooker-Feldman* doctrine bars collateral attacks on state-imposed attorney discipline.  *See Johnson v. Sup. Ct. of Ill.*, 165 F.3d 1140, 1141 (7th Cir. 1999) (collecting cases).  That discipline, however, must be imposed pursuant to a final judgment.  *See Mains v. Citibank, N.A.*, 852 F.3d 669, 675 (7th Cir. 2017) ("The *Rooker-Feldman* doctrine prevents lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced.").  A state's law determines the finality of its own court's decisions.  *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011).  Orders disbarring or suspending attorneys for a term of years clearly count as "final."  *See Johnson*, 165 F.3d at 1141 (blocking plaintiff's Section 1983 suit against the ARDC after he was disbarred).  Additionally, in a case very similar to this one, *Mehta v. Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois*, 681 F.3d 885 (7th Cir. 2012), the Seventh Circuit held that interim suspensions imposed under Rule 774 also constitute final judgments for the purposes of *Rooker-Feldman*.  *Id.* at 887 ("A Rule 774 suspension is 'interim' only in the sense

that a later case, initiated separately in the Illinois Supreme Court to seek disbarment, might supersede it."). Mehta, like Rosen, faced an interim suspension before his final punishment for converting his clients' money and then lying about it. *Id.* at 886. He challenged the Illinois Supreme Court's suspension order in federal court as creating an "unconstitutional risk of bias" in his overall proceedings, but the Seventh Circuit applied *Rooker-Feldman* to bar Mehta's claim. *Id.* at 887.

As a result, any attempt by Rosen to challenge the finality of the Interim Suspension Order must fail. Rosen admits as much, stating instead that the Bankruptcy Court's error was in thinking *Mehta* applied at all. (Appellant's Opening Br. 11.) The Procedural Order, he claims, is not a final judgment under Illinois law, and is therefore ripe for collateral attack in federal court. (*Id.* at 12.) Rosen distinguishes *Mehta* on this basis, attempting to thread the needle by saying that his rights were not violated by the suspension, but by procedural errors underlying the suspension. (*Id.* at 11.)

In reality, it makes no difference what order Rosen claims to be challenging: either one is "inexorably intertwined" with his interim suspension. *See Levin v. Att'y Reg. & Discip. Comm. of the Sup. Ct. of Ill.*, 74 F.3d 763, 767 (7th Cir. 1996) ("The gravamen of Levin's entire complaint is that his disciplinary proceedings were unconstitutional. All of Levin's claimed injuries stem from the application of allegedly unconstitutional Illinois Supreme Court Rules to his disciplinary proceedings, and he seeks relief to redress these particular injuries."). Whether through a direct attack on his Rule 774 interim suspension or a roundabout challenge as to the procedural rightness of the underlying hearings, Rosen wants his suspension overturned. His stated rationale for trying to wedge this declaratory judgment claim into a student loan discharge proceeding makes this goal abundantly clear. To receive a discharge, Rosen had to show that his present hardship was not self-inflicted: "In other words, whether Appellant *actually committed* the egregious acts that he was accused of." (Appellant's Reply to ARDC 2) (emphasis added). "The question of whether Appellant received a fair hearing was significant in

that determination and would have helped determine whether the student loan was dischargeable." (*Id.*)

To allow Rosen to pursue his declaratory judgment claim in federal court would be to "effectively void the state court ruling." *Levin*, 74 F.3d at 766; *see also Johnson*, 165 F.3d at 1141–42 (applying *Rooker-Feldman* to bar a former attorney's lawsuit even though it was based on "the actions that led to the disbarment, rather than the disbarment itself."). With section 1983 actions like that brought in *Mehta*, the Seventh Circuit has long stated that "[a] plaintiff may not circumvent the effect of the *Rooker–Feldman* doctrine simply by casting [his] complaint in the form of a federal civil rights action." *Remer v. Burlington Area School Dist.*, 205 F.3d 990, 997 (7th Cir. 2000) (quoting *Maple Lanes, Inc. v. Messer*, 186 F.3d 823, 825 (7th Cir.1999)). Nor may a plaintiff attempt to do so under the guise of a declaratory judgment, as Rosen seeks to do here.

Rosen insists that both Bankruptcy Judge Cassling and District Judge Guzman did not understand the nuanced argument he was making, and "assum[ed] that [he] sought review of Order M.R. 26812"—the Interim Suspension Order. The record defeats this notion. In denying Rosen's Rule 8015 Motion for Rehearing, Judge Cassling stated:

> The debtor [ ] states that he simply seeks this Court to review the procedural proceedings and the Supreme Court order and rule on the question of whether his due process rights were violated by not following the remand order of the Review Board for a new hearing. [citation omitted]. This Court finds that the debtor's arguments lack merit. The debtor candidly admits in this motion that he is asking this Court to review the proceedings and the Illinois Supreme Court's order.
>
> . . .
>
> [I]t is clear that the debtor is a state-court loser complaining of injuries caused by an order of the Illinois Supreme Court. While the debtor denies this, he is, in fact indirectly asking this Court to review the Illinois Supreme Court decision to suspend him from practicing law. Success before this Court would require overturning the Illinois Supreme Court decision.

(Bankr. R. 550:14–24, 551:7–14.) In denying Rosen leave for interlocutory appeal, Judge Guzman added: "there are simply no 'substantial grounds for difference of opinion' with the

bankruptcy court. Its *Rooker-Feldman* analysis is plainly supported by the Seventh Circuit's recent decision in *Mehta*[.]" (Bankr. R. 207.) This court agrees and affirms the dismissal of Rosen's declaratory judgment claim.

### b.   The Bankruptcy Court Lacked Jurisdiction under 28 U.S.C. § 157

Defendant-Appellee ARDC did not initially raise the lack of subject-matter jurisdiction (Bankr. R. 261–268), but courts have an independent duty to ensure subject-matter jurisdiction, which cannot be waived by the parties. *Dexia Credit Local v. Rogan*, 602 F.3d 879, 883 (7th Cir. 2010). Bankruptcy Judge Cassling properly noted the lack of core jurisdiction in open court when denying Rosen's Rule 8015 Motion for Rehearing. (Bankr. R. 551–553.)

Bankruptcy courts may hear and determine all cases and "core proceedings" arising under Title 11 of the U.S. Code. 28 U.S.C. § 157(b)(1). "[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1239 (7th Cir. 1990) (quoting *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990)). The statute also provides a non-exhaustive list of "core proceedings" which include: orders to turn over property, motions modifying the automatic stay, or "determinations as to the dischargeability of particular debts." 28 U.S.C. § 157(b)(2)(E), (G), (I). Bankruptcy courts may also hear non-core proceedings "related to" cases under Title 11. 28 U.S.C. § 157(c)(1). Controversies are not "related to" a bankruptcy within the meaning of Section 157(c) unless their resolution "affects the amount of property available for distribution or the allocation of property among creditors." *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989) (quoting *In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987)).

Rosen's declaratory judgment claim does not fit either category. He attempts to link potential reinstatement as an attorney to the dischargeability of his student loan debt, but there is no serious argument that this declaratory judgment "could arise only in the context of a bankruptcy case." Aptly stated by District Judge Guzman, "[t]he adversary proceeding against

ARDC really has nothing to do with Plaintiff's underlying bankruptcy. The ARDC is not a creditor, and the resolution of his Due Process claim would not affect the assets in his bankruptcy estate[.]" (Bankr. R. 206.) Simply put, United States Bankruptcy Courts are not in the business of issuing declaratory judgments on the constitutionality of state court attorney-discipline hearings.

Rosen cites no case law that that challenges this conclusion. He merely repeats that vindication in his disciplinary proceeding will demonstrate that his hardship is not self-inflicted and therefore support his claim for a discharge under *Brunner*. (Appellant's Opening Br. 13; Appellant's Reply to ARDC 2.) But this argument fails on the facts and the law. Even if this court heard the claim and declared that the Illinois Supreme Court violated Rosen's constitutional rights, there is little evidence that Rosen would prevail on the merits in a new disciplinary hearing. Rosen's charges were proved with clear and convincing evidence. The Review Board did at one point agree that Rosen deserved a new hearing, but did so only "reluctantly." (Bankr. R. 311.) Then, considering the matter a second time, the Review Board stated:

> Respondent expressed no remorse for the harm he caused. The Hearing Board considered Respondent's attempts to portray everyone else wrongdoers as aggravating. Indeed, instead of accepting responsibility for his misappropriations, Respondent embarked on a path of lies and misrepresentations in an effort to blame others, including his own mother, for his own misdeeds.

(Bankr. R. 330.) In short, a declaratory judgment is unlikely to alter the result of the disciplinary proceeding.

The court notes, further, that if Rosen were to prevail on his declaratory judgment, the result might not be what he expects; a declaration that effectively clears Rosen's name before the ARDC would undermine his claim that he is unable to pay his student loan. That result confirms, in the court's view, that this dispute is independent of Rosen's efforts to discharge his student loan.

**3.      The Bankruptcy Court Properly Found Rosen's Student Loans Non-Dischargeable**

Student loans are generally non-dischargeable in Chapter 7 bankruptcy unless failing to discharge the loans "would impose an undue hardship on the debtor."  11 U.S.C. § 523(a)(8). The Bankruptcy Code does not define "undue hardship," but the statutory language suggests that Congress did not mean to permit "garden-variety" hardship of the kind accompanying all bankruptcy filings.  *O'Hearn v. Educ. Credit Mgmt. Corp.*, 339 F.3d 559, 564 (7th Cir. 2003). The Seventh Circuit, like many others, follows the "*Brunner* test" when evaluating undue hardship from student loans. *Matter of Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner*, 831 F.2d at 396).  That test requires a debtor claiming "undue hardship" to establish three elements:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.*

The debtor bears the burden of proving all three elements by a preponderance of the elements.  *Goulet*, 284 F.3d at 777 (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).  As explained below, Judge Cassling did not err in finding that Rosen failed to meet any prong of the *Brunner* test.  Accordingly, Rosen's student loans were properly found to be non-dischargeable in bankruptcy.

**a.      "Minimal Standard of Living"**

The first prong of *Brunner* calls for analysis of whether requiring the debtor to repay his loans "would cause his standard of living to fall below that minimally necessary."  *Roberson*, 999 F.2d at 1135.  This requires showing "more than simply tight finances."  *In re Kehler*, 326 B.R. 142, 147 (N.D. Ind. Bankr. 2005) ("[T]he debtor cannot succeed under this prong by demonstrating that the repayment of the student loans would require him to make major

personal and financial sacrifices and to live within a restricted budget.") A common starting point is to ask whether the debtor is minimizing his expenses and maximizing his income. *Armstrong v. U.S. Dep't of Educ.,* No. 10-8118, 2011 WL 6779326, at *5 (C.D. Ill. Bankr. Dec. 27, 2011). Since the standard-of-living inquiry is judged on a household basis, it is appropriate to consider a non-debtor spouse's income when determining whether a debtor can service his loans. *See Clark v. U.S. Dep't of Educ.*, 341 B.R. 238, 251 (N.D. Ill. Bankr. 2006); *Armstrong*, 2011 WL 6779326 at *4 (collecting cases).

Rosen is married and has no dependents. His wife works and earns a salary of $60,000 per year. (Bankr. R. 226.) Rosen is currently unemployed, but takes in $1,300 per month in Social Security benefits. (*Id.*) Ms. Rosen is responsible for their household expenses, which amount to $2,300 per month. (Bankr. R. 225.) Though Rosen testified that "he voluntarily contributes $500 per month" to the monthly household expenses, his only personal expense is a $100 monthly phone bill. (*Id.*) The Rosens have owned their home for nearly 30 years, and paid off their mortgage in 2014. (*Id.*)

As ECMC conceded that Rosen had minimized his expenses, the bankruptcy court focused on whether Rosen had maximized his income. (Bankr. R. 226–227.) It found Rosen's efforts sorely lacking. Rosen testified at trial that his suspension prevents him from working in his preferred field as an attorney, and that the negative publicity surrounding his suspension prevents him from working in alternative white-collar fields like accounting or marketing. (Bankr. R. 226.) He claims to have applied for approximately one hundred jobs, including many managerial and executive roles. (*Id.*) The court noted, however, that Rosen "offered little to no evidence as to the details of the job positions for which he had applied, the requirements of the jobs, or the results of his application submissions. . . . [Rosen] pursued a very narrow job search focused solely on jobs in the finance area." (Bankr. R. 227.) Rosen also cites poor health as an additional factor in his failure to obtain employment. Judge Cassling noted how this, too, was not supported by evidence showing that Rosen's health prevented him from working. (Bankr. R.

227.) Rosen admitted to managing his various ailments with medication. (*Id.*) Judge Cassling ultimately rejected Rosen's contention that his "self-diagnosis of morbid obesity" and other treatable health issues were a substantial impediment to employment. (*Id.*); *see also Owens v. U.S. Dep't of Educ.*, 525 B.R. 719, 722 (C.D. Ill. Bankr. 2015) (denying the debtor's health-based arguments for hardship where the debtor offered no evidence that they were substantial impediments).

On this record, Judge Cassling did not err in finding that Rosen failed to adequately maximize his income. Rosen may believe work outside of the legal or financial fields is inappropriate, but, as the Seventh Circuit noted, "it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans, or for that matter to meet all sorts of other financial obligations." *O'Hearn*, 339 F.3d at 566.

Rosen hotly contests the bankruptcy court's findings, particularly findings concerning income required for loan repayment. (Appellant's Opening Br. 16, 18–19.) Judge Cassling found that Rosen could afford to pay off his loans in full over a thirty-year period if he were to supplement his existing Social Security income by $14,000. (Bankr. R. 228–229.) As Rosen was 62 years old at the time of trial, he insists that "anything over a ten-year repayment period would be unreasonable." (Appellant's Opening Br. 19.) A ten-year repayment period, meanwhile, would require monthly payments of $5,558, or a yearly income of $66,696 after taxes. Rosen claims that he cannot be expected to live—much less work—until his early nineties, and cannot be expected to earn enough money to pay off the loan in a shorter period. (*Id.* at 16, 18–19.)

A thirty-year repayment schedule may well be unrealistic, given Rosen's age and purported health, but this is not dispositive. As the Bankruptcy Court noted, "the possibility that the Plaintiff will not live until the end of the repayment period is not a factor that the Court must consider in applying the *Brunner* test." (Bankr. R. 229) (citing *Armstrong*, 2011 WL 6779326, at *9). Courts nationwide have reached the same conclusion: repayment into advanced age is a

consequence of taking out loans late in life. *See, e.g., Kehler*, 326 B.R. at 148 (finding a 25-year repayment period to be a reasonable option for a 62-year old debtor); *Spence v. Educ. Credit Mgmt. Corp.*, 541 F.3d 538, 544 (4th Cir. 2008) (refusing to discharge a 61-year-old debtor's loans); *Connor v. U.S. Dep't of Educ.*, No. 15-10541, 2016 WL 1178264, at *3 (E.D. Mich. Mar. 28, 2016) (collecting cases). Likewise, this court is not convinced that Rosen should be rewarded in 2017 with a repayment period ending earlier than the one he faced when he took out the loan in 2001. The maximum thirty-year repayment period, had Rosen made regular payments from the outset, would have ended when he was 78 years old. If measured from the end of Rosen's final deferment in 2007, he would have been on the hook for minimum monthly payments until the age of 84. It is disingenuous for Rosen to argue now that any repayment period that has him working until he is over 72 years old is "unreasonable."

In any event, arguing over the actual duration of Rosen's remaining work life is not meaningful. Rosen failed to prove that he was maximizing his income, and as result, any repayment target he proposes is pure conjecture. *Roberson*, 999 F.2d at 1137 ("While any precise prediction of his future earnings and expenses is necessarily speculative, Mr. Roberson has not indicated his road to recovery is obstructed[.]"). Rosen also failed to corroborate his testimony with evidence of his numerous reasons why he could not be expected to work at present or into the future. *See id.; O'Hearn*, 339 F.3d at 567 (remanding to the bankruptcy court based on insufficient evidence to support the debtor's discharge). This court agrees with Judge Cassling that Rosen failed to prove by a preponderance of the evidence that being required to pay his loan would reduce his standard of living below a minimum acceptable level.

**b.    "Additional Circumstances"**

The second *Brunner* factor is whether "additional circumstances exist indicating that [Rosen's inability to pay] is likely to persist for significant portion of the repayment period." *Tetzlaff*, 94 F.3d at 759 (citation omitted). The Seventh Circuit has expanded on this prong by stating that student loan discharges should be based on "a certainty of hopelessness" requiring

evidence "of additional exceptional circumstances, strongly suggestive of continuing inability to repay." *Goulet*, 284 F.3d at 778 (citation omitted). In addition, "undue hardship encompasses a notion that the debtor must not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." *Roberson*, 999 F.2d at 1136 (internal citation and quotations omitted).

On this front, Rosen repeats his arguments that his health, age, poor credit, non-profit industry specialization, and lack of work history since 2008 all serve as "impediments to employment." (Appellant's Opening Br. 20.) Rosen's health and age have been addressed at length by both the Bankruptcy Court, and by this court. The remaining factors are not convincing, nor particularly relevant. Poor credit history does not render a person unemployable. And while Rosen has not worked as an accountant since 2008, he ran his own legal practice from that time until his suspension in 2015.

Rosen's remaining arguments ignore the fact that he possesses valuable skills, apart from his law license. As noted, he has master's degrees in accounting and business administration, and 24 years of accounting experience, including work as the chief financial officer of a non-profit charity. (Bankr. R. 226, 231.) Judge Cassling concluded that Rosen "is clearly capable of earning a living" and observed that his "capable pro se representation" throughout his bankruptcy case is a strong "indicator of his marketable job skills." (*Id.* at 231) (quoting *Tetzlaff*, 794 F.3d at 760). There is little evidence that Rosen suffers from the barriers traditionally viewed as sufficient "additional circumstances" under *Brunner*. *See Goulet*, 284 F.3d at 778 (listing psychiatric problems, lack of usable job skills, and severely limited education as standard examples). This court is not persuaded that Rosen's unemployment will continue indefinitely.

Rosen asserts an additional error: that the Bankruptcy Court wrongly assumed that his circumstances stood to improve as soon as the suspension of his law license ended in 2018. (Appellant's Opening Br. 3.) The Illinois Supreme Court suspended Rosen for three years and

until further order of the court. According to Rosen, this means he will never be able to practice law again, and qualifies as a permanent additional circumstance required by *Brunner*. (Appellant's Opening Br. 20–21.)

Illinois Supreme Court Rule 767(f) outlines six factors relevant to a request for reinstatement: (1) the nature of the misconduct; (2) the petitioner's maturity and experience at the time discipline was imposed; (3) whether the petitioner recognizes the nature and seriousness of the misconduct; (4) whether the petitioner has made restitution; (5) the petitioner's conduct since being disciplined; and (6) the petitioner's candor and forthrightness in presenting evidence. Other than his good conduct since being suspended, Rosen asserts that he "cannot meet any of the other factors for reinstatement." (Appellant's Opening Br. 21.) This court is not convinced. Every single factor listed above is within Rosen's reasonable control. If Rosen indeed faces a permanent suspension, it is only because he continues to deny responsibility for his actions. Rosen, for example, freely admits that he has not made the court-ordered restitution payment of $57,646.74 to his former clients.[6] (*Id.*) This is notable considering Rosen has $1,200 per month to spend as he pleases. The Hearing and Review Boards recommended that Rosen show cause for his reinstatement because "[n]othing in the record demonstrates that [Rosen] is currently willing or able to abide by the Rules of Professional Conduct." (Bankr. R. 305.) Rosen's arguments here on appeal confirm that observation.

For the same reasons, Rosen laments his injured reputation—which "any prospective employer can search [for] . . . on Google." (Reply Brief of Appellant to Response Brief of Defendant-Appellee ECMC [21] ("Appellant's Reply to ECMC"), 11.) Rosen asserts:

---

[6] The record does not say whether Rosen managed to discharge the $57,646.74 restitution order in bankruptcy. Rosen implies that he did (Appellant's Opening Br. 21 n.4)— although numerous subsections of 11 U.S.C. § 523(a) suggest otherwise. Regardless, the fact that Rosen's obligation was discharged in bankruptcy does not prohibit the Illinois Supreme Court from considering it in its reinstatement calculus.

> The reasoning of the [Bankruptcy] Court fails to consider that, whether purposeful or not, the published information by the ARDC and others makes it impossible for Appellant to find employment from an employer who expects honesty in their new hire. There are few positions, professional or otherwise, where honesty is not required.

(Appellant's Opening Br. 17.) The record shows the bankruptcy court did consider Rosen's argument, but concluded that the negative information posted online is the result of Rosen's own willful actions. (Bankr. R. 230.)

The court declines to disturb the bankruptcy court's determination on this issue. Rosen did not establish an ongoing inability to repay his loans—or, at least, that the inability was not self-inflicted.

### c. "Good Faith Efforts to Repay"

The final prong of the *Brunner* test—good faith efforts—can be dealt with briefly. Rosen emphasizes case law showing what he is *not* required to show: efforts to maximize income, payment of a minimum amount or percentage of income, or enrollment in an income-based repayment plan. (Appellant's Reply to ECMC 11–12) (citing *Henry v. U.S. Dep't of Educ.*, No. 14-7021, 2016 WL 3681201, at *6 (C.D. Ill. Bankr. July 5, 2016); *Krieger*, 713 F.3d at 884). The court has no quarrel with these observations; but Rosen has made virtually no effort to show what he *has* done to establish his good faith.

The evidence is flatly inconsistent with such a finding. Rosen has never prioritized paying his student loans, regardless of his income. Rosen worked and earned a salary throughout his graduate studies, which he pursued back-to-back over the course of 16 years. In his final year at the Larkin Center, he reported a salary of $80,000. Yet Rosen paid just $11,000 towards his loans over the span of 37 years. To pay even that small percentage, he enlisted his mother's assistance. Rosen has made no real effort to maximize his income. Finally, and most tellingly, Rosen defaulted on his student loan in 2011, while he was still a lawyer in good standing. He was not charged with misconduct by the ARDC until August 2012, and not suspended until January 2015. In the meantime, Rosen did not make even partial payments

towards his loans out of his $1,200 monthly surplus income or his household's yearly income tax returns.

Rosen takes pride in some of these facts, asserting that the duration of time between finishing school and pursuing a student loan discharge is an important signal of good faith. (Appellant's Opening Br. 23) (citing *Owens v. U.S. Dep't of Educ.*, 525 B.R. 719, 723 (C.D. Ill. Bankr. 2015) (denying a discharge to a "young, healthy, employable person with a master's degree, who has made no payments and filed bankruptcy within three years")). Notably, however, the very case Rosen cites, *Owens*, includes this observation:

> The debtor contends that the fact that he has consolidated his loans and applied for and been granted several deferments, satisfies the requirement of a good faith effort to repay the loans. . . . Deferments and forbearances afford a way for the borrower to retain or be restored to a non-default status without having to make a payment. The third *Brunner* prong contemplates payment efforts, not administrative reconfigurations that merely adjust the contractual terms or the borrower's default status.

525 B.R. at 722–23. Rosen managed to avoid default on his student loans for 31 years because he attended school (and kept taking out more loans) nearly the entire time. Even after graduating law school in 2001, Rosen kept his loans in deferment until 2007. This is not evidence of a good faith effort to pay.

In the end, the primary driver of any sympathy for Rosen's current situation is the sheer magnitude of his student loan debt. The fact that he may be unable, practically, ever to repay the loan in full does not, however, move the court. Rosen appears to believe that because the likelihood of paying off the entire loan within his lifetime is slim, he should not bother trying. (See Appellant's Reply to ECMC 13 ("The question is not whether Appellant could earn some amount of money from employment, but whether [he] can earn a sufficient amount to repay the student loans.")) The court disagrees. "It would be perverse to allow the debtor to benefit from [his] own inaction, delay and recalcitrance by automatically granting discharge simply because the debt is a sizeable one.*" Educ. Credit Mgmt. Corp. v. Jesperson*, 571 F.3d 775, 781 (8th Cir.

2009) (quoting *United States v. Kephart*, 170 B.R. 787, 792 (W.D.N.Y. 1994). This court declines to reward Rosen's choices at the expense of American taxpayers.

## CONCLUSION

For the reasons stated, the judgment of the Bankruptcy Court is AFFIRMED.

ENTER:

Dated: September 29, 2017

_____
REBECCA R. PALLMEYER
United States District Judge